# United States Court of Appeals
## For the Eighth Circuit

_____

No. 13-2592
_____

Larry Alexander, M.D.

*Plaintiff - Appellant*

v.

Avera St. Luke's Hospital

*Defendant - Appellee*

_____

Appeal from United States District Court
for the District of South Dakota - Aberdeen

_____

Submitted: June 12, 2014
Filed: September 30, 2014

_____

Before LOKEN, BRIGHT, and GRUENDER, Circuit Judges.

_____

LOKEN, Circuit Judge.

     Pathologist Larry Alexander suffered a heart attack in March 2008, underwent a heart transplant in May 2009, and was hospitalized for bipolar disorder in October 2010. In August 2011, Avera St. Luke's, a non-profit corporation operating St. Luke's Hospital in Aberdeen, South Dakota, terminated its December 2008 Pathology Services Agreement with Dr. Alexander, invoking the provision that either party may terminate the Agreement with or without cause on ninety days prior written notice.

Alexander brought this action against Avera, alleging violations of the Americans with Disabilities Act (ADA), 42 U.S.C. § 12102 et seq., the Age Discrimination in Employment Act (ADEA), 29 U.S.C. § 621 et seq., the Family and Medical Leave Act (FMLA), 29 U.S.C. § 2617 et seq. and the South Dakota Human Relations Act (SDHRA), S.D. Codified Laws § 20-13-1 et seq. The district court[1] granted Avera's motion for summary judgment, concluding that each of these statutory claims failed because undisputed material facts demonstrated that Alexander was an independent contractor rather than an Avera employee. Alexander appeals. Reviewing the grant of summary judgment on this issue *de novo*, see Lerohl v. Friends of Minn. Sinfonia, 322 F.3d 486, 488 (8th Cir.), cert. denied, 540 U.S. 983 (2003), we affirm.

## I. Background

Dr. Alexander's relationship with Avera began in January 1991, when he entered into a Contract for Professional Services with another pathologist, Dr. Roy Burt, who had entered into an exclusive agreement to provide Avera "all of Hospital's necessary pathological services and provide the medical direction and supervision of the Department of Pathology." The Contract with Burt expressly provided that Alexander "shall apply for and become a member of" the Hospital's medical staff; that the services Alexander would provide under the Contract are those of "a professional physician working as an independent contractor," not as an employee of Burt; that Burt would have no authority to control the manner in which Alexander performed his pathology services; that Alexander, not Burt, would pay all applicable federal and state taxes and withholdings, including social security taxes; and that Alexander would secure and maintain professional liability insurance in prescribed amounts.

---

[1] The Honorable Charles B. Kornmann, United States District Judge for the District of South Dakota.

In 1994, at Burt's suggestion, Alexander took over Burt's duties as director of pathology at the hospital and entered into a new contract with Avera, entitled "Agreement for Pathology Services." Alexander and Avera entered into substantially identical contracts in 1998, 2002, and 2008. Like the 1991 contract with Burt, the contracts between Alexander and Avera all explicitly stated that Alexander would work as an independent contractor and not as an employee. Each contract specified that Avera would have no authority to control or direct performance of Dr. Alexander's services. The contracts provided that Avera would neither pay nor withhold taxes and that Alexander was solely responsible for paying taxes, obtaining malpractice insurance, and paying for his professional licenses. The contracts gave Alexander the right to hire assistants and substitute pathologists at his own expense; Alexander took advantage of this provision by hiring his wife as an assistant at a substantial salary in the years 2008-2010.

Alexander's duties remained relatively uniform throughout his time at Avera. All the contracts required him to provide pathology services at the hospital in accordance with Avera's bylaws, rules, and regulations, which apply to all members of the hospital's medical staff. Beginning in 1994, the contracts obligated Alexander as Medical Director of the hospital's Department of Clinical and Anatomical Pathology to help meet its teaching requirements, and to confine the "majority" of his professional services to the hospital. The 1994, 1998, and 2002 contracts required Alexander to contract separately with Burt "for the provision and rendition of [Burt's pathology] services," specified Alexander's annual compensation, and stated the parties' understanding that one-half of that amount "shall be paid by Alexander to Burt for services rendered under this Agreement." The 2008 contract omitted these provisions and significantly reduced Alexander's annual compensation. The 2008 contract further provided:

> In the event [Alexander] is unable to provide necessary services to St. Luke's for a period beyond thirty-five (35) days during a calendar

-3-

>year due to illness, vacation, continuing medical education or any other reason whatsoever, [Alexander] shall be responsible for arranging and compensating a qualified and competent substitute pathologist and provide professional services to and on behalf of St. Luke's under the terms of this Agreement. . . . For purposes of vacation, sick leave, and continuing medical education, [Alexander] shall be permitted a total of thirty-five (35) days per year.

>                          *   *   *   *   *

>[Alexander] shall be solely responsible for compensating any and all substitute/assistive personnel/pathologists.

For income tax purposes, Avera provided Alexander a Form 1099 each year, which listed his income as "nonemployee compensation," rather than a W-2 form used to report wages paid to employees. Alexander reported his income from Avera on Schedule C of his federal Form 1040 tax return, the schedule used by sole proprietors. Alexander listed as Schedule C business expenses advertising costs, payments to substitute pathologists, and wages he paid his wife. He also filed a Schedule SE calculating his self-employment FICA tax obligation.

Beginning in 1994, Avera provided all necessary facilities, equipment, and non-medical assistants. Avera billed patients and paid Alexander in equal monthly installments. In practice, Alexander testified, he and Burt were free to determine their own work schedules so long as one of them was present while surgeries were taking place. No one from Avera ever supervised his practice of medicine, and he could not recall ever being assigned duties not specifically called for by the contracts. From 1995-2010, Alexander exercised his contractual right to work outside St. Luke's Hospital by serving as Medical Director of the South Dakota State Public Health Laboratory.

By 2004, Alexander's relationship with Burt was so acrimonious that Avera required the two pathologists to attend conflict resolution sessions with a psychiatrist. Their relations improved, but in March 2011, the conflict resumed, and Avera learned that Burt would terminate his relationship with St. Luke's Hospital. In August, Avera gave Alexander ninety-day notice it was terminating his contract. To offset the departure of its two principal pathologists, Avera entered into contracts with two other pathologists, Dr. Thomas Buttolph and Dr. Bari Fritz. Unlike Avera's prior contracts with Alexander and Burt, the Buttolph and Fritz contracts were entitled "Physician Employment Agreement[s]" and began by declaring that the "Hospital hereby employs the Physician" (emphasis added). The contracts provided that Avera would maintain malpractice insurance for Buttolph and Fritz; provide them with benefits including health insurance, retirement plans, and license-fee allowances; and withhold income and FICA taxes from their bi-weekly paychecks. In return, Buttolph and Fritz agreed to work a specified number of hours per week, not compete with the hospital during the terms of their employment and for two years thereafter, and not practice medicine outside the hospital without Avera's permission. Alexander's contracts contained none of these provisions.

## II. Discussion

Alexander appeals the dismissal of his statutory claims that Avera violated his rights under the ADA, ADEA, FMLA, and SDHRA. Each of these statutes limits its protections to "employees." Independent contractors are not covered. The key question on appeal, therefore, is whether Alexander in performing professional services under the 2008 Pathology Services Agreement was working as Avera's employee or as an independent contractor. Although we conclude the answer is the same under each of these statutes, the last two require a somewhat different analysis.

**A. The ADA and ADEA Claims.** The ADA and the ADEA define an "employee" as an individual employed by an employer. 42 U.S.C. § 12111(4); 29

-5-

U.S.C. § 630(f). In <u>Nationwide Mut. Ins. Co. v. Darden</u>, 503 U.S. 318, 323 (1992), the Supreme Court again considered the meaning of the statutory term "employee" when Congress has provided a "completely circular" definition that "explains nothing." Reversing a Fourth Circuit decision based upon "the declared policy and purposes" of the statute in issue, there ERISA, the Court reaffirmed a "well-established" principle: "when Congress has used the term 'employee' without defining it . . . Congress intended to describe the conventional master-servant relationship as understood by common-law agency doctrine." <u>Id.</u> at 321, 322-23 (quotation omitted).

We have consistently applied this principle in determining whether a plaintiff asserting claims under the ADA or the ADEA was a protected employee, or an unprotected independent contractor. <u>See</u> <u>Ernster v. Luxco, Inc.</u>, 596 F.3d 1000, 1004 (8th Cir. 2010), and cases cited. In weighing a nonexhaustive list of relevant common-law factors the Supreme Court derived from the Restatement (Second) of Agency § 220(2) (1958) in <u>Darden</u>, 503 U.S. at 323-24,[2] "all of the incidents of the relationship must be assessed and weighed with no one factor being decisive." <u>Lerohl</u>, 322 F.3d at 489, quoting <u>Darden</u>, 503 U.S. at 324. "The district court may properly consider economic aspects of the parties' relationship." <u>Wojewski v. Rapid City Reg'l Hosp., Inc.</u>, 450 F.3d 338, 343 (8th Cir. 2006) (quotation omitted). Though the employee/independent contractor issue is fact intensive under <u>Darden</u>, we

---

[2]"In determining whether a hired party is an employee under the general common law of agency, we consider the hiring party's right to control the manner and means by which the product is accomplished. Among the other factors relevant to this inquiry are the skill required; the source of the instrumentalities and tools; the location of the work; the duration of the relationship between the parties; whether the hiring party has the right to assign additional projects to the hired party; the extent of the hired party's discretion over when and how long to work; the method of payment; the hired party's role in hiring and paying assistants; whether the work is part of the regular business of the hiring party; whether the hiring party is in business; the provision of employee benefits; and the tax treatment of the hired party."

have consistently held that it is an issue of law and therefore "may often be decided by the court on a summary judgment record." Ernster, 596 F.3d at 1006.

Because "the hiring party's right to control the manner and means by which the [work] is accomplished" is central to Darden's common-law inquiry, 503 U.S. at 323, we begin our analysis with that factor. Alexander argues that he was subject to Avera's control because he (like every other doctor at the hospital) was required to abide by Avera's bylaws, rules, and regulations, and Avera controlled the means by which Alexander performed his services by providing equipment, supplies, and staff, and by billing patients. However, this court and several other circuits have held that a doctor who has lost staff privileges at a hospital was an independent contractor, not a hospital employee. See Wojewski, 450 F.3d at 343, and cases cited. As we noted in Glascock v. Linn Cnty. Emergency Med., PC, 698 F.3d 695, 698 (8th Cir. 2012), "the issue of control is less useful in the context of emergency room physicians than in some other settings because a hospital 'must assert a degree of conflicting control over every doctor's work . . . to discharge its own professional responsibility to patients,' regardless whether the physician is an employee or independent contractor," quoting Cilecek v. Inova Health Sys. Servs., 115 F.3d 256, 260 (4th Cir. 1997), cert. denied, 522 U.S. 1049 (1998).

In this case, the parties agreed Avera would have no right to control the specific manner in which Alexander rendered pathology services. Alexander testified that no one from Avera exercised control over his professional services, and that he maintained complete freedom to set his schedule and determine the manner of his performance, including the hiring of substitute pathologists at his own expense, so long as he provided the services required by the 2008 Agreement. Alexander explicitly agreed in each contract that he was an independent contractor, as is typical in hospital/staff physician relationships. Thus, this factor supports the district court's conclusion that Alexander was an independent contractor. Cf. Lerohl, 322 F.3d at

-7-

490 (symphony musicians are not employees simply because they are always subject to the conductor's "control" at rehearsals and concerts).

Consideration of the other Darden common-law factors further supports this conclusion. Especially indicative of an independent-contractor relationship are that Alexander was not provided with benefits or malpractice insurance, Avera did not withhold income and FICA taxes from Alexander's monthly compensation and reported his income on a Form 1099, and Alexander reported his compensation as the income of a self-employed independent contractor. See Lerohl, 322 F.3d at 492. By contrast, Avera withheld taxes from its payments to employee-physicians such as Dr. Buttolph and Dr. Fritz, and reported those payments on W-2 forms.

Other facts strongly suggest an independent-contractor relationship: Alexander, unlike Buttolph and Fritz, had the contractual right to hire substitute pathologists and assistants at his own expense (including his wife), had no weekly hours requirement, was never assigned duties not specified in his contract, held other medical employment during much of his time at Avera, and was never bound by a non-compete agreement. These facts demonstrate that Alexander retained substantial "freedom of choice" in determining the extent to which he committed his available professional time to St. Luke's Hospital, though his commitment was certainly more substantial than the musicians made in Lerohl, 322 F.3d at 491-92.

The remaining factors cited in Darden are inconclusive or of little relevance. The level of skill required, location of the work, and source of equipment and staff are not indicative of employee status because all hospital medical staff are skilled and must work inside the hospital using its equipment. "When a physician shows up to work in today's world -- either as an independent contractor or a full-fledged employee -- he no longer is likely to carry all relevant medical instruments in a black satchel. Instead, it is expected that he will make full use of the hospital's physical facilities during the course of his service." Tsosie v. United States, 452 F.3d 1161,

1164 (10th Cir. 2006). Similarly, that Avera is a non-profit "business" and that pathology services are a regular part of that business do little to illuminate this issue because the services of hospital medical staff -- regardless of employment status -- are part of the business of the hospital at which those services are performed.

Having carefully reviewed the summary judgment record, we conclude that the balance of common-law Darden factors as applied by this court tilts heavily towards the district court's determination that Alexander was an independent contractor of St. Luke's Hospital under his 2008 Pathology Services Agreement. Accordingly, the district court did not err in granting summary judgment dismissing Alexander's ADA and ADEA claims.

**B. The FMLA Claim.** Congress in the FMLA adopted by cross-reference the definition of "employee" in the Fair Labor Standards Act (FLSA) -- "any individual employed by an employer" -- which is the same "circular definition" considered in Darden. 29 U.S.C. §§ 2611(3), 203(e)(1). However, the cross-reference to the FLSA also adopted that statute's definition of "employ" -- "to suffer or permit to work." Id. §§ 2611(3), 203(g). The "striking breadth" of this latter FLSA definition "stretches the meaning of 'employee' to cover some parties who might not qualify as such under a strict application of traditional agency law principles." Darden, 503 U.S. at 326. In prior cases, the Supreme Court construed this broad FLSA definition as meaning that "employees are those who as a matter of economic reality are dependent upon the business to which they render service." Bartels v. Birmingham, 332 U.S. 126, 130 (1947). Alexander argues that his FMLA claim should be governed by a six-factor "economic realities" test, rather than the common-law agency principle of Darden. This is a question of first impression for this court, and one that is largely unexplored by our sister circuits.

The FMLA's cross-reference to the FLSA in defining a protected "employee" was no accident. As the Senate Labor and Human Resources Committee explained:

-9-

> The [FMLA] accommodates the important societal interest in assisting families, by establishing a minimum labor standard for leave. The bill is based on the same principle as the child labor laws, the minimum wage . . . and other labor laws that establish minimum standards for employment.

S. Rep. No. 103-3, at 4 (1993), reprinted in 1993-2 U.S.C.C.A.N. 3, 6-7. But simply applying to Alexander's FMLA claim an "economic realities" test developed in cases that involved FLSA minimum wage or maximum hours claims is not appropriate. In the first place, Dr. Alexander's work in a "professional capacity" was totally exempt from the FLSA's minimum standards. See 29 U.S.C. § 213(a)(1).

More importantly, prior to the Supreme Court's decision in Darden, "nearly every appellate court . . . applied a test described as a hybrid of the common-law test and the economic realities test." Wilde v. Cnty. of Kandiyohi, 15 F.3d 103, 105 (8th Cir. 1994). In Wilde, we saw "no significant difference between the hybrid test and the common-law test articulated by the Supreme Court in Darden." Id. at 106. We have continued to apply that hybrid test in resolving employee/independent contractor issues under statutes that adopted the "circular definition" at issue in Darden. See, e.g., Glascock, 698 F.3d at 698 (Title VII); Wojewski, 450 F.3d at 343 (ADA); Lerohl, 322 F.3d at 489. Therefore, we conclude that the hybrid test we apply in determining whether plaintiff is an "employee" under statutes governed by Darden -- a test that expressly takes into account "economic realities" -- is the appropriate test to apply in construing the term "employee" in the FMLA.[3]

---

[3] In Haybarger v. Lawrence Cnty. Adult Prob. and Parole, 667 F.3d 408, 417-18 (3d Cir. 2012), the Third Circuit with little analysis applied an "economic reality" test in determining whether a public employee's supervisor was an "employer" who could be individually liable under the FMLA. We express no view as to the standard for determining a supervisor's individual liability, which is not an issue in this case.

-10-

As we have explained, Alexander was an independent contractor, not an employee, under the common-law standard of Darden, taking into account economic realities such as Alexander's freedom to use his fixed contractual compensation to hire substitute pathologists and assistants, his responsibility to pay his professional licensing and malpractice insurance expenses, and the economic independence reflected on his tax returns. Focusing more directly on the "economic realities" underlying the FMLA, Congress considered this a statute establishing minimum labor standards for unpaid leave. Dr. Alexander's 2008 Pathology Services Agreement more than met the FMLA's minimum standard. It provided him unlimited freedom to hire -- at his expense -- "a qualified and competent substitute pathologist" if he was "unable to provide necessary services to St. Luke's for a period beyond thirty-five (35) days during a calendar year" for any reason. Thus, the conclusion that Alexander was an independent contractor rather than an employee does no violence to the "economic realities" underlying the FMLA.

We thus conclude that the district court correctly granted summary judgment dismissing Alexander's FMLA claim.

**C. The SDHRA Claim.** Count III of Alexander's complaint alleged that Avera, with knowledge of his disabilities, discharged him in violation of the SDHRA, which declares it to be "an unfair or discriminatory practice for any person, because of . . . disability . . . to discharge an employee." S.D. Codified Laws § 20-13-10. There are few South Dakota reported cases applying this statute.

The first question is whether Alexander was an "employee" for purposes of § 20-13-10. The SDHRA provides explicit guidance on this question, defining an "employee" as "any person who performs services for any employer for compensation, whether in the form of wages, salary, commission, or otherwise." S.D. Codified Laws § 20-13-1(6). On appeal, the parties completely ignore this statute, instead urging us to apply the distinct definitions of "employee" in SDCL § 60-1-1,

-11-

part of the Labor and Employment Title, or SDCL § 62-1-3, part of the Workers' Compensation Title, or the definition of an exempt "independent contractor" in SDCL § 61-1-11, part of the Unemployment Compensation Title. Although the Supreme Court of South Dakota has not addressed the question, we predict it would reject these contentions and consider the meaning of "employee" as defined in the SDHRA a distinct question, to be answered in the context of that employment discrimination statute, drawing guidance from prior cases and authorities distinguishing employees and independent contractors in other common law and statutory contexts.

The second question is whether the SDHRA protects employees but not independent contractors, like the federal statutes we have considered. In interpreting the SDHRA, the South Dakota Supreme Court has followed federal court decisions construing analogous federal anti-discrimination statutes. See Huck v. McCain Foods, 479 N.W.2d 167, 169-70 (S.D. 1991). Consequently, we predict the Supreme Court of South Dakota would conclude that § 20-13-10 does not apply to independent contractors, just as we predicted the Supreme Court of North Dakota would apply its analogous anti-discrimination statute in Birchem v. Knights of Columbus, 116 F.3d 310, 314 (8th Cir. 1997). Alexander does not argue on appeal that § 20-13-10 protects independent contractors, only that he was Avera's employee.

The third question is what standard the Supreme Court of South Dakota would apply in determining whether Alexander was an employee or an independent contractor for purposes of § 20-13-10. We consider this question more uncertain because there are various formulations of the standard in prior South Dakota cases that raised the question in different contexts. But a common theme of those cases was an emphasis on the control factor, both in common law tort cases where the issue was critical to liability, such as Halverson v. Sonotone Corp., 27 N.W.2d 596, 598-99 (S.D. 1947), and in cases where the issue was critical to a statutory workers' compensation or unemployment insurance claim, such as Egemo v. Flores, 470 N.W.2d 817, 821-22 (S.D. 1991).

-12-

In evaluating the control factor, the Supreme Court of South Dakota has more than once looked to the Restatement (Second) of Agency for guidance. See Buisker v. Thuringer, 648 N.W.2d 817, 820 (S.D. 2002) (consulting § 225 on a "gratuitous employee" issue); Steen v. Potts, 61 N.W.2d 825, 827 (S.D. 1953) (consulting § 220 on a common law contract issue). In Darden, the Supreme Court looked to the Restatement and common-law principles in deciding the employee/independent contractor issue, emphasizing "the hiring party's right to control the manner and means by which the product is accomplished." 503 U.S. at 323. Bearing in mind the desirability of construing federal and state anti-discrimination statutes in harmony, and the fact that the Darden common-law test is consistent with the control factor emphasized by the Supreme Court of South Dakota in other contexts, we predict that Court would apply the Darden test -- perhaps with the "economic realities" supplement we apply -- in determining whether Alexander was a protected employee, or an independent contractor not covered by the SDHRA.

The final question is whether the Supreme Court of South Dakota would decide that this question is one of fact for a jury, or a question of law, as federal courts have ruled in applying federal anti-discrimination statutes. This is by no means an easy question. See Ernster, 596 F.3d at 1005-07. But it is a question we need not decide in this case because, for the reasons explained in Part II.A. of this opinion, we conclude that no reasonable jury could find that Alexander was an employee of Avera for purposes of § 20-13-10, and therefore the district court properly granted summary judgment dismissing the SDHRA claim. We further conclude that summary judgment was proper applying the somewhat different two-factor test applied in Egemo, 470 N.W.2d at 821.

The judgment of the district court is affirmed.

_____